IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cr. No. 25-cr-04148-MLG |
| | ) | |
| **LUCAS GOMEZ-LOPEZ,** | ) | |
| | ) | |
| Defendant. | ) | |

**<u>UNITED STATES' SENTENCING MEMORANDUM SUPPLEMENT</u>**

The United States supplements its earlier Sentencing Memorandum with information regarding the events culminating in a homicide that took place which ultimately gave rise to the charge for which Defendant has plead guilty and is to be sentenced.

The Pre-Sentence Report briefly outlines these events in paragraph 24, concluding that "defendant and the victim had been in an argument when the victim exited his vehicle to confront the defendant when the defendant opened fire." Though not entirely inaccurate, this is substantially incomplete. The United States recognizes that the pre-sentence report writer did not have access to all the discovery the parties did, which was copious and totaled about 30,000 Bates stamped pages, and reached this conclusion based on limited information. The United States and the First Judicial District Attorney's Office, which initially investigated and reviewed the case, concluded that Defendant acted in self-defense in committing the homicide, and prosecuted him accordingly for other offenses. After review of the discovery (police reports, witness interviews, photographs/videos, cell phone records, other records), the United States believes the evidence would establish the following sequence of events:

On the afternoon of August 18, 2024, Marcelino Herrera (the homicide victim) and five others drove together in a Toyota Tundra to pick up Jacob Velarde from his home in Espanola with the goal of securing drugs. Velarde suggested they do so from a dealer who lived in Chimayo. Velarde then used Herrera's phone to attempt to arrange this deal with the dealer. The group then drove to the dealer's house. The dealer was not there and the group did not acquire the drugs as planned. While Velarde was knocking on the dealer's front door a second vehicle, a Toyota 4Runner driven by Defendant, pulled up, seemingly coincidental but likely at the dealer's home for the same purpose as the first group. Velarde then got into the 4Runner, which was occupied by Defendant and another person.

Seemingly upset that Velarde was still in possession of Herrera's cell phone and money intended for the drug deal, Herrera exited his vehicle, threatened Velarde, who was still sitting in the 4Runner, and retrieved those items from him. Herrera then returned to his Tundra, which was parked in a nearby dirt lot. Defendant yelled at Herrera, telling him it was unnecessary to have threatened Velarde. As Defendant was then trying to leave, Herrera cut him off with his vehicle. Herrera's girlfriend witnessed him grab a firearm from inside of the Tundra, put the firearm inside of his pocket, get out of his vehicle, and approach Defendant who was in the 4Runner. A verbal argument between Herrera and Defendant then ensued at the driver's side window of the 4Runner. Witnesses in the Tundra said that Herrera produced and pointed his gun at Defendant first, but that Defendant fired before Herrera was able to. Defendant fired three shots at Herrera, striking him twice. One bullet struck Herrera's head (which was fatal), the second struck his torso, and the third hit the inside of the door frame of Defendant's 4Runner, which means Defendant was still seated inside his vehicle when Herrera approached and pointed his gun at

2

him. There was gun residue on Herrera indicating that the shots that struck him were fired at close range. Defendant then fled the scene in the 4Runner. The gun which Defendant used to shoot Herrera was never recovered. The gun Herrera pointed at Defendant was recovered at the homicide scene and was loaded but had not been discharged. The 4Runner that Defendant was driving was not his vehicle, and the gun he used was procured from the glove-box, according to his passenger.

Herrera was a large and violent person with a violent criminal history, which included battery on a household member; aggravated burglary; kidnapping; criminal damage to property; and shooting at a dwelling. There is a video in discovery of Herrera assaulting an unarmed person in an Espanola gas station parking lot, about two weeks prior to the homicide. In it Herrera strikes the victim from behind, knocks him to the ground, and repeatedly kicks and stomps on the victim's head, repeatedly punches him in the head, and continues to do so even after being pulled off of the victim by bystanders, twice. While one cannot be certain that, at the time of the homicide, Defendant was aware of this assault by Herrera, as well as Herrera's criminal history. However, given the small size of their social circle and community in which they lived, it seems likely that he would have been. If he were, this would bolster his valid fear that Herrera was about to shoot him, which is consistent with the physical evidence and the witness's statements.

For these reasons the United States (and the First Judicial District Attorney's Office) believe Defendant has a viable claim of self-defense for the homicide committed on August 18, 2024, and that a jury would likely agree.

3

Respectfully submitted,

RYAN ELLISON
First Assistant United States Attorney


_____

Chris Schultz
Assistant United States Attorney
201 3rd St. NW, suite 900
Albuquerque, NM 87103
(505) 224-1503